**IRANIAN SHIPPING LINES, S.A.,
Plaintiff,**

v.

**Peter MORAITES, et al, Defendants.**

**Rudolph V. ALOSIO, Plaintiff,**

v.

**IRANIAN SHIPPING LINES, S.A., et al.,
Defendants.**

No. 72 Civ. 1392 MIG.

United States District Court,
S. D. New York.

June 13, 1974.

Kissam & Halpin, New York City, for Iranian Shipping Lines, S.A.

Howard L. Jacobs, P. C., New York City, for Guaranty Bank.

GURFEIN, District Judge:

The defendant Guaranty Bank & Trust Company ("the Bank") has moved to dismiss the amended complaint [1] on the grounds that venue in the Southern District of New York is improper and that the Court lacks jurisdiction over Guaranty.

On September 29, 1972 Judge Charles Brieant referred the motion to Hon. Samuel C. Coleman as Special Master "to hear and report as to whether jurisdiction exists pursuant to § 302(a) (1)(2) of the New York C.P.L.R. as applied by Rule 4(e), Fed.R.Civ.P., or otherwise, and whether venue is proper." Judge Coleman held an evidentiary hearing. On August 30, 1973, he issued his report recommending denial of Guaranty's motion. A Supplemental Report was filed on October 31, 1973. Objec-

tions to the Special Master's Report were filed on November 27, 1973.

On January 2, 1974 the case was reassigned to the writer. A pre-trial conference was held on January 17, 1974 at which time it was agreed that all matters pending in this case would be held in abeyance until each party submitted a status report concerning the claims, the issues to be tried, discovery to date, and discovery still to be completed. (The last report was received on April 3, 1974 and this motion again became *sub judice*). It is now possible for me to dispose of the motion.

THE COMPLAINT

The plaintiffs are Iranian Shipping Lines ("ISL"), an Iranian corporation, and Nick C. Spanos, a 48% shareholder and former director. The Special Master found that during the period from January 1965 to August 1966, ISL maintained offices in New York and had employees here. During that period ISL owned and chartered three dry cargo vessels for purposes of import and export from New York (and Atlantic Gulf Ports) to the Persian Gulf. ISL was the first corporation with Iranian registered vessels to make that run. Between April 1965 and April 1966, ISL alleges gross freight earnings in the amount of $6,500,000.

The defendants, numbering approximately thirty, consist of individuals, corporations and banks each purportedly involved in a conspiracy to bilk and destroy ISL. Some of the defendants were among the original shareholders and directors of ISL or were the controlling shareholders of companies which were shareholders; others were and are competitors, or financially related to competitors. At least eight of the defendants (mostly shareholders or directors of ISL) are collectively referred to as the Manta Group; and eight others (mostly

---

1. By agreement between counsel, this motion also applies to the cross-claim served on Guaranty in Alosio v. Iranian Shipping Lines, formerly 67 Civ. 9 now consolidated with 72 Civ. 1392.

competitors) are referred to as the Teheran Group.

The amended complaint ("Complaint") alleges, as a first claim, violations of Section 4 of the Clayton Act (15 U.S.C. § 15) and Sections 1, 2 of the Sherman Act, Section 73 of the Wilson Tariff Act of 1894 (15 U.S.C. §§ 1, 2, 8). The second claim seeks to prevent the defendants from dissolving ISL lest that oust the jurisdiction of the Court. The third claim alleges a conspiracy to defraud and damage ISL, its minority shareholders and creditors. The fourth claim is a derivative shareholders' claim which simply realleges the earlier counts and seeks an accounting and damages.

The aims of the conspiracy are listed as follows:

"(a) the permanent elimination of ISL as a competitor in the commerce of the United States with foreign nations in the Persian Gulf; (b) the monopolization of that commerce by the TEHERAN DEFENDANTS; and (c) that said combination and conspiracy should remain and be concealed and undetected so that none of the conspirators should suffer any consequences of liability by reason of their participation therein."

"The substantial terms of the said combination and conspiracy consisted of a continuing overall agreement to cause the financial and economic ruin of ISL and the takeover of ISL's business and assets (including its vessels or their value and its receivables) by the defendants without any payment to ISL or its creditors and to make any revival or restoration of ISL's liner service or competition in the aforesaid commerce practically impossible, by destroying ISL's credit, name and reputation with ISL suppliers, shippers and customers, including the Government of Iran, and thus, among other things, causing ISL to be dropped as one of the Iranian partici-

pant members in the RCD." [2] (Complaint ¶ 27).

As a consequence of this alleged conspiracy ISL claims to have suffered damage to its business and property in excess of $5,650,000. ISL prays for damages, lost profits and injunctive relief.

The Special Master conducted the evidentiary hearing within the framework of the allegations of the complaint that the Bank, to accomplish the objectives of the antitrust conspiracy, participated in the conspiracy in various ways.

The gist of the conspiracy alleged was that the Manta Group (in addition to defrauding Spanos) conspired to mulct ISL of its assets, including its three ships, and to drive it out of business for the benefit of the Teheran Group with which the Manta Group was associated. The conspiracy involved alleged concealment of loans and bank deposits from shareholders and creditors, putting one Nasser Afshar ("Nasser") falsely in a position to appear to be a man of influence with the Royal Family of Iran, and making it appear that he was such a large creditor that *bona fide* creditors would be discouraged from a contest with Nasser over ISL's assets. It is alleged that to further the conspiracy the Bank appointed Nasser its attorney-in-fact to act for the Bank in collecting the Bank's purported claims against ISL of some $110,000.

According to the Special Master's Report the claim is that although the Bank had made a loan to ISL with a guaranty by the Mantas, the Bank failed to proceed against the Mantas, but rather, at their instance, appointed Nasser to follow assets in Iran for the Bank, and that the failure to wipe out the Bank debt by proceeding against the guarantors, left ISL in a precarious financial condition. This, it is said, was part of a scheme to put ISL out of business so that the Teheran Group in conjunction with the Manta Group could take over

---

**2.** The RCD is an organization for common economic development sponsored by the Governments of Turkey, Pakistan and Iran.

the shipping business between the Atlantic Coast and Iran.

The Bank has not answered the complaint pending the determination of the motion. The Special Master found that "what was said to have been done between Mantas and the Bank was done in Chicago where the Mantas resided." The Bank knew, he found, that the line had its United States "home" in New York—its headquarters for the shipping operations, as well as its main bank account. He used the test of whether the acts in Chicago "were concerted and had or were intended to have effect elsewhere,—specifically in this district."[3] He concluded that venue in this district was proper and has so reported.

## THE MOTION ON VENUE

■ The Bank is an Illinois corporation, with its principal place of business in Chicago and no business or assets in New York. Nonetheless, the plaintiffs claim, and Judge Coleman agreed, that venue is proper in New York even as to the Bank because the "claim arose" here, under 28 U.S.C. § 1391(b). The 1966 amendment to Section 1391(b) provides:

> "A civil action wherein jurisdiction is not founded solely on diversity of citizenship may be brought only in the judicial district where all defendants reside, or in which the claim arose, except as otherwise provided by law."

The general venue statute supplements the venue provisions of the antitrust laws. Albert Levine Associates v. Bertoni and Cotti, 314 F.Supp. 169, 170 (S.D.N.Y.1970); Adams Dairy Co. v. National Dairy Products Corp., 293 F.Supp. 1135, 1140–42 (W.D.Mo.1968); Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp., 291 F.Supp. 252 (E.D.Pa.1968). See Hoffman Motors Corp. v. Alfa Romeo S.p.A., 244 F.Supp. 70, 84 (S.D.N.Y. 1965); but cf. Albert Levine Associates v. Bertoni and Cotti, 309 F.Supp. 456 (S.D.N.Y.1970).

The 1966 amendment, which added "in which the claim arose" was intended by Congress to close the gap, since that basis for venue "in most cases provides a proper venue even in multiple-party situations. The development supports the view that Congress does not in general intend to create venue gaps, which take away with one hand what Congress has given by way of jurisdictional grant with the other. Thus, in construing venue statutes, it is reasonable to prefer the construction that avoids leaving such a gap." Brunette Machine Works Ltd. v. Kockum Industries, Inc., 406 U.S. 706, 710, n. 8, 92 S.Ct. 1936, 1939, 32 L.Ed.2d 428 (1972). As Mr. Justice Marshall observed, ". . . the venue provisions are designed, not to keep suits out of the federal courts, but merely to allocate suits to the most appropriate or convenient federal forum." Id. 406 U.S. at 710.

In an antitrust conspiracy involving many defendants, it is hardly conceivable that all the defendants, residing or doing business in different states, will be happy with the plaintiff's choice of forum. Nor can the plaintiff, with any degree of practicality, pursue two or more actions involving severed defendants on the same alleged conspiracy. A balance of convenience must be found. Judge Lord, in a considered opinion, thought (at least in a price-fixing case) that merely establishing that the defendant was injured is not enough. Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp., *supra*. The test he laid down was the "weight of contacts" test. If, by that, he meant an evaluation of a specific calculus of contacts, I cannot altogether agree.

■ It seems to me that although the agency theory of co-conspiratorial acts may not be enough for venue, see Bertha Building Corp. v. National Theatres Corp., 248 F.2d 833 (2 Cir. 1957), cert. denied, 356 U.S. 936, 78 S.Ct. 777, 2 L.Ed.2d 811 (1958); H. L. Moore Drug

3. Rept. p. 8.

Exchange, Inc. v. Smith, Kline & French Laboratories, 384 F.2d 97 (2 Cir. 1967), the performance of acts which knowingly tend to injure the plaintiff in the forum district may be enough, in appropriate circumstances. Judge Metzner in Albert Levine Associates v. Bertoni & Cotti, *supra*, 314 F.Supp. 169, quite properly, in my view, emphasized the place of injury in determining where the claim arose for purposes of § 1391(b). See also Adams Dairy Co. v. National Dairy Products Corp., *supra*, 293 F. Supp. at 1141–42. Of course, the circumstance that the claim may also have arisen in the Northern District of Illinois "would not derogate [from] its having arisen here." Carter-Wallace, Inc. v. Ever-Dry Corp., 290 F.Supp. 735, 739 (S.D.N.Y.1968) (Mansfield, J.).

If the requisite intent to join in a conspiracy to put ISL out of business is assumed for purposes of the motion, then the activities of the defendant in Chicago lose their local character and become tortious acts, the effect of which is felt in this district. They are felt in this district because it is here that ISL was allegedly destroyed.

The facts show that the plaintiff ISL maintained a New York office staffed with employees. It operated and chartered three dry cargo vessels between the United States Gulf and Persia. It maintained a terminal pier facility in New York. ISL employed an agent, Keyship, in New York. And ISL maintained a bank account here and had New York accountants. Moreover, the alleged purpose of the conspiracy was to keep ISL ships from sailing out of the port of New York.

Guaranty was aware of ISL's New York contacts. In May, 1965 defendants George Manta and Christ Karafotias met with a Mr. Angelos of the Bank. Karafotias told Angelos "that Iranian Shipping Lines started a liner service, and in that connection, that an office was in New York and that the ships were starting to move, and that there were some chartered ships, and some money was needed and if he could accommodate us to give a loan." [4] In February, 1966 new demands for money emanated from the ISL Keyship office in New York and Karafotias testified that this was why a second loan was made from the Bank in the amount of $100,000.[5] The duplicate financing statement was given to Karafotias by Guaranty; Karafotias had Spanos and Babayan sign it in New York and Karafotias returned the signed duplicate financing statement to the Bank. The loan ratification agreement, moreover, was signed in New York.

Though the ratifications in New York may not have been enough, standing alone, the performance of allegedly illegal and ill-motivated acts which found their target in New York should be enough in these circumstances. It is not necessary that the conspirators meet in the district to support a venue which is based on the ground that the claim "arose" here. In antitrust law, the metaphor of the target has been so often used in "standing" cases vis-a-vis plaintiffs that it does not seem unreasonable where the standing of the plaintiff is assumed to use the target metaphor for venue as well.

There are some thirty defendants. The case is here. On a balance of convenience, which should be considered in the spirit of the amended venue statute, the whole alleged conspiracy should be tried in one court.

There is, of course, no attempt to pass upon the merits, and, despite the misgivings of several parties, the findings of the Special Master were not intended by him to, nor will they, survive the motion. The slate will be wiped clean and findings will be based on the presentation of evidence *de novo*.

Since there is no question of subject-matter jurisdiction over the antitrust claims or of service of process under 15 U.S.C. § 27, I confirm the report of the Special Master and hold that, in the cir-

4. Tr. before Special Master at 1479.

5. Tr. at 1543.

cumstances of this multiple defendant action, there is proper venue in this district.

The motion to dismiss on behalf of the Guaranty Bank and Trust of Chicago on the ground of improper venue is denied.

It is so ordered.