CARIBE TRAILER SYSTEMS, INC. and John R. Immer, Plaintiffs,

v.

PUERTO RICO MARITIME SHIPPING AUTHORITY et al., Defendants.

Civ. A. No. 78–0435.

United States District Court, District of Columbia.

April 19, 1979.

Elmer F. Bennett, Washington, D. C., for plaintiffs.

John T. Schell, Washington, D. C., for defendants PRMSA, PRPA, TTT, PRMMI and TKM.

Edward M. Shea, Washington, D. C., for defendants Reynolds, McLean, GPRL, and Sea-Land.

Gilbert E. Geldon, Washington, D. C., for defendant Sun Shipbuilding.

Richard S. Cornfeld, Washington, D. C., for defendants AUT and TOTEM.

GASCH, District Judge.

### MEMORANDUM

This is an action to recover treble damages for alleged violations of sections 1, 2, and 3 of the Sherman Antitrust Act.[1] The basis of the complaint is an alleged conspiracy by twelve private and governmental entities to create a monopoly in ocean transportation between the East Coast and Gulf ports of the United States and the ports of Puerto Rico. Presently before the Court are the motions of ten defendants to dismiss the complaint on grounds of improper venue and lack of personal jurisdiction, and the motions of nine defendants for summary judgment on the ground that their conduct is immunized from antitrust liability under the state action doctrine recognized in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). For the reasons discussed below, the Court concludes that defendants' motions should be granted.

### FACTUAL BACKGROUND

Plaintiff Caribe Trailer Systems, Inc. ("Caribe") is a Puerto Rico corporation with its principal place of business in Washington, D. C. Plaintiff John R. Immer is the principal owner and chairman of the board of Caribe. Caribe was organized for the purpose of engaging in ocean transportation between East Coast and Gulf ports of the continental United States and the ports of Puerto Rico, but its activities never became operational. Plaintiffs contend that because of defendants' alleged antitrust violations, plaintiffs were unable to obtain financing to commence their operations and therefore were prevented from competing in the Puerto Rico trade. They seek a permanent injunction against defendants' activities as well as treble damages, costs, and attorneys fees.

Each defendant named in this lawsuit had some involvement in the creation or operation of the Puerto Rico Maritime Shipping Authority ("PRMSA"), a government agency organized by the Commonwealth of Puerto Rico in 1974 to operate Puerto Rico's maritime transportation system. Because of its small size, insular position, and limited natural resources, Puerto Rico has difficulty in maintaining a self-sufficient economy and is dependent on external trade for

---

1. 15 U.S.C. §§ 1–3 (1976).

economic and social development. Ocean transportation carries more than ninety-eight percent of its external trade and as a result, ocean freight costs exert a potentially disruptive influence of all aspects of Puerto Rico's economy. Trade between East Coast and Gulf ports represents the major avenue of traffic between Puerto Rico and the mainland United States and accounts for approximately eighty-five percent of all dry cargo transported and over seventy percent of Puerto Rico's total external trade.

Because of the island's dependence on ocean transport, the Governor of Puerto Rico in 1973 established a commission to determine whether the Commonwealth should take steps to acquire the vessels then employed by commercial steamship companies in the Puerto Rico trade. This acquisition was intended to assure the availability of vessels and to maintain price stability with respect to transportation costs. Following negotiations with the three major carriers, the commission proposed legislation that would establish a nonstock public corporation to own or lease the vessels and equipment necessary to conduct the Mainland-Puerto Rico trade. On June 10, 1974, the Commonwealth legislature enacted this proposal as Act 62 and created the Puerto Rico Maritime Shipping Authority as a governmental instrumentality to operate Puerto Rico's maritime transportation system.[2]

PRMSA, which is incorporated in Puerto Rico, consists of a governing board of seven members, all of whom are residents of Puerto Rico, appointed by the Governor with the advice and consent of the Puerto Rico Senate. Its operations are exempt from taxation and from all fees required for the prosecution of judicial proceedings. The Statement of Motives contained in Act 62 expresses the intent of the Puerto Rico legislature that PRMSA acquire and operate shipping lines and terminal facilities as a public service and, in doing so, that it not be subject to the antitrust laws or any other limitations that would hinder its legislative goal.[3]

Following its organization, PRMSA acquired the rights to eleven ships and to various marine transportation facilities from the three major carriers that served the Puerto Rico trade: Seatrain, Inc.,[4] and defendants Sea-Land Service, Inc. ("Sea-Land"), and Transamerican Trailer Transport, Inc. ("TTT"). The acquisition of these assets occurred in the following manner. Defendant American Union Transport, Inc. ("AUT"), a 63.3% shareholder in TTT, and defendant Sun Shipbuilding & Dry Dock Co. ("Sun Ship"), a 30% shareholder, directly conveyed their interests in TTT to PRMSA. TTT has since become a dormant corporation because PRMSA operates its assets under PRMSA's own name and its officers and directors are the same as PRMSA's.

The vessels owned by Sea-Land were transferred through a similar transaction. Sea-Land and Gulf-Puerto Rico Lines ("GPRL") are both wholly owned subsidiaries of defendant McLean Industries, Inc. ("McLean"). McLean is a holding company which in turn is wholly owned by defendant R. J. Reynolds Industries ("Reynolds"). McLean and Reynolds conveyed their interests in Sea-Land to PRMSA.

Before these transfers were effected, the Commonwealth of Puerto Rico sought a business review letter from the Antitrust Division of the Department of Justice with respect to PRMSA and the proposed acquisition.[5] Although the acquisition would give PRMSA control over ninety percent of then-existing ocean shipping services, the

---

2. Act of Puerto Rico Maritime Shipping Authority, Act No. 62 (June 10, 1974), see Exh. A in Appendix to Puerto Rico Defendants' Motion to Dismiss the Complaint.

3. Id. See also Affidavit of Roberto Jugo D'Acosta in support of Puerto Rico Defendants' Motion to Dismiss the Complaint, at ¶ 2.

4. Seatrain is not named as a defendant to this action.

5. Motion of Defendant Sun Shipbuilding & Dry Dock Co. to Dismiss Complaint, Exh. B.

Antitrust Division granted favorable clearance on July 22, 1974.[6]

PRMSA has an ongoing contractual relationship with defendant Puerto Rico Marine Management, Inc. ("PRMMI"), a Delaware corporation that provides operational direction for PRMSA's vessels and is responsible for manning, husbanding, docking, loading and unloading, and booking and soliciting cargo. PRMMI is paid a management fee for these services. PRMMI was organized in 1974 as a wholly owned subsidiary of McLean. On January 15, 1976, McLean entered into a stock purchase agreement with defendant TKM Corporation (TKM) under which TKM acquired all the stock of PRMMI. Defendant Trans Ocean Transportation Executive Management, Inc. ("TOTEM") also has managed cargo vessels on behalf of PRMSA.

The final defendant named in this action is the Puerto Rico Ports Authority ("PRPA"), an agency of the Puerto Rico government with broad responsibility for maritime matters.[7] One of the major functions of the PRPA is to supervise the port of San Juan, the second largest containership port in the world, by assigning vessels to suitable berths, entering into terminal leases with steamship operators, and managing dock facilities. A director of PRPA headed the commission that recommended creation of PRMSA.

On March 13, 1978, plaintiffs instituted the present lawsuit, charging each of the twelve defendants with conspiracy, monopoly, and restraint of trade in violation of sections 1, 2, and 3 of the Sherman Antitrust Act, 15 U.S.C. §§ 1–3. Specifically, plaintiffs allege that defendants secretly discussed and determined that maritime transportation between Puerto Rico and the mainland should be operated as a monopoly and devised a plan for achieving this goal, which included formation of PRMSA.[8]

Presently before the Court are motions to dismiss for improper venue and lack of personal jurisdiction filed by defendants, Reynolds, McLean, GPRL, PRMSA, PRPA, TTT, PRMMI, TKM, AUT, and TOTEM. All defendants with the exception of Reynolds, McLean, and GPRL have joined in a motion to dismiss, or in the alternative for summary judgment[9] originally filed by PRMSA, PRPA, and TTT (the "Puerto Rico defendants"). The governmental entities seek dismissal on the ground that their actions were immune from liability for antitrust violations under the *Parker* doctrine. The private defendants have moved to dismiss on the ground that their actions were compelled by the Commonwealth of Puerto Rico and therefore also exempt from liability under *Parker*.

*VENUE*

Although this complaint alleges that the defendants have engaged in a "combination and conspiracy" in violation of the Sherman Act, plaintiffs must establish venue as to each defendant separately. 15 Wright, Miller & Cooper, *Federal Practice & Procedure* § 3818, at 116 (1969); *see Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp.,* 291 F.Supp. 252, 262 (C.D.Pa.1968). In the present case, plaintiffs attempt to establish venue in the District of Columbia on the alternative grounds that defendants transacted business in this district and that the cause of action arose in this district.

Venue over corporate defendants in antitrust actions may be established under the special antitrust venue provisions contained

6. *Id.,* Exh. C, Letter of Thomas E. Kauper, Assistant Attorney General, Antitrust Division, Department of Justice.

7. PRPA was created by an act of the Puerto Rico Legislature on May 7, 1942. P.R.Laws Ann. tit. 23, §§ 331 *et seq.* (1955). Its purpose, as set out in its enabling statute, is ". . . to develop and improve, own, operate, and manage any and all types of transportation facilities and air and marine services in, to, and from the

Commonwealth of Puerto Rico . . . ." *Id.* § 336.

8. *See* More Definite Statement of Paragraph 22 of Plaintiffs' Complaint.

9. Because the motions to dismiss are supported by affidavits and other exhibits, the Court will treat them as motions for summary judgment under Fed.R.Civ.P. 56.

in sections 4 and 12 of the Clayton Act [10] or under the general federal venue provisions.[11] Each of the moving defendants claims that none of the bases for venue contained in these statutes are satisfied in the present case.

■ Section 4 provides for venue in any district in which the defendant resides, is found, or has an agent. A corporation resides in a district only if it is incorporated or licensed to do business in the state in which the district lies, is actually doing business in that state, or has its principal place of business there. 14 Von Kalinowski, *Antitrust Laws and Trade Reg.* § 104.04[4] (1978). The affidavits submitted by the moving defendants in support of their motions to dismiss establish that none of these defendants are incorporated or licensed to do business in the District of Columbia, nor do they directly conduct business or have their principal place of business here.

Section 12 permits venue in any district in which a corporation is an inhabitant, may be found, or transacts business. A corporation is said to be an inhabitant of the state of its incorporation. *Aro Mfg. Co. v. Automobile Body Research Corp.*, 352 F.2d 400, 404 (1st Cir. 1965), *cert. denied*, 383 U.S. 947, 86 S.Ct. 1199, 16 L.Ed.2d 210 (1966). A corporation is found where it has "presence and 'continuous local activities' within the district." *Fox-Keller, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 338 F.Supp. 812, 815 (E.D.Pa.1972). The moving defendants do not satisfy either of these requirements.

■ Section 12 also permits a corporation to be sued in any district in which it "transacts business." This standard was enacted to enlarge the jurisdiction of the federal courts with respect to venue by substituting "practical, business conceptions for the previous hair-splitting legal technicalities encrusted on the 'found'—'present'—'carrying-on-business' sequence . . .." *United States v. Scophony Corp.*, 333 U.S. 795, 808, 68 S.Ct. 855, 862, 92 L.Ed. 1091 (1948). "Transacting business" for the purpose of section 12 has a meaning independent of definitions which courts have given the same phrase in construing other statutes. The test is whether the corporation is doing business in the district of any substantial character, even if its business is entirely interstate in character and is transacted by agents who do not reside within the district. *Id.* at 807, 68 S.Ct. 855; *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 372–73, 47 S.Ct. 400, 71 L.Ed. 684 (1927).

■ Whether a defendant has transacted business is largely a factual question to be determined in each case. In making this determination, courts look for tangible manifestations of doing business.[12] Such manifestations are absent here. None of the moving parties has officers, employees, or agents within the district.[13] None has offices or owns property here, nor do they maintain corporate records, telephones, telephone listings, or bank accounts. Plaintiffs' complaint does not suggest any other

---

10. 15 U.S.C. §§ 15, 22 (1976).

11. 28 U.S.C. § 1391 (1976).

12. *E. g.*, *Brandt v. Renfield Importers, Ltd.*, 278 F.2d 904, 909–11 (8th Cir.), *cert. denied*, 364 U.S. 911, 81 S.Ct. 274, 5 L.Ed.2d 226 (1960) (being subject to state regulation, licensing, or taxes constitutes doing business); *Frey & Son v. Cudahy Packing Co.*, 228 F. 209, 212–13 (D.Md.1915) (maintaining tangible property within the state, such as real estate, inventory, bank accounts, or corporate records constitutes doing business); *Magnetic Eng'r & Mfg. Co. v. Dings Magnetic Separator Co.*, 86 F.Supp. 13, 16 (S.D.N.Y.1949), *modified*, 178 F.2d 866 (2d Cir. 1950) (employing persons within the district constitutes doing business).

13. Plaintiffs argue that various defendants retained economic and marine consultants, attorneys, and law firms in Washington, who assisted in the creation of PRMSA. The Court concludes that these independent contractors were not employees or agents for venue purposes and contracting for legal and economic consultation services does not constitute "transacting business" in a jurisdiction. *Control Data Corp. v. Carolina Power & Light Co.*, 274 F.Supp. 336 (S.D.N.Y.1967) (North Carolina corporation's engaging engineering and technical consultants in New York, negotiating with investment houses, and retaining legal counsel did not constitute "doing business").

activity of a similar nature that might bring defendants within the transacting business standard.

■ Some courts have held that a corporation may be found to be transacting business for venue purposes in the district in which coconspirators were found and where the conspiracy had its impact.[14] In *Giusti v. Pyrotechnic Industries, Inc.,*[15] the United States Court of Appeals for the Ninth Circuit held that because all conspirators are agents for each other, the presence of one defendant in a district can subject his coconspirators to suit in that district as their agent. This theory, however, has been rejected by other courts [16] and this Court concludes that its application here would be contrary to the principle that venue must be established for each defendant separately. *See* 15 Wright, Miller & Cooper, *Federal Practice and Procedure* § 3818.

With respect to defendants Reynolds, McLean, and GPRL, plaintiffs do not contend that these entities directly transact business in this district but instead argue that venue is properly laid against them here ·because of their relationship with defendant Sea-Land. There is no dispute that venue exists in the District of Columbia for Sea-Land because it is licensed to do business here. Sea-Land and GPRL are wholly owned subsidiaries of McLean, a holding company, which in turn is wholly owned by Reynolds. Plaintiffs allege that the management and business operations of these four defendants are so commingled and integrated that venue laid against Sea-Land lies against the moving defendants. In support of this argument, plaintiffs have attempted to detail the various degrees of participation by Reynolds, Sea-Land, McLean, and GPRL in the sale of Sea-Land's assets to PRMSA.[17]

■ When a parent and its subsidiary are joined as defendants in an antitrust action, venue over the parent may be based on the local activities of its subsidiary "if the relationship between the parent and the subsidiary is such that the subsidiary may be considered the agent or the alter ego of the parent." *Audio Warehouse Sales, Inc. v. U.S. Pioneer Electronics Corp.,* 1975–1 Trade Cas. ¶ 60,213 (D.D.C.1975). Generally when the subsidiary maintains a separate legal identity, its presence in the district will not be sufficient to bring the foreign parent corporation within the ambit of section 12. *Phillip Gall & Son v. Garcia Corp.,* 340 F.Supp. 1255, 1259 (E.D.Ky.1972).

■ It is also generally accepted that mere ownership of stock in a subsidiary corporation transacting business in a district does not establish venue against the parent corporation. *See, e. g., O. S. C. Corp. v. Tobshiba America, Inc.,* 491 F.2d 1064, 1066 (9th Cir. 1974). In order for the parent corporation to be amenable to suit, it must exercise a control relationship over its subsidiary. *See Tiger Trash v. Browning-Ferris Indus., Inc.,* 560 F.2d 818, 822 (7th Cir. 1977), *cert. denied,* 434 U.S. 1034, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978). This concept of control is a method of determining whether the ownership of the subsidiary is a mere investment or is an alternative

14. *E. g., Ross-Bart Port Theatre v. Eagle Lion Films, Inc.,* 140 F.Supp. 401, 402 (E.D.Va.1954); *DeGolia v. Twentieth Century-Fox Film Corp.,* 140 F.Supp. 316, 318 (N.D.Cal.1953); *Don George Inc. v. Paramount Pictures, Inc.,* 111 F.Supp. 458, 462 (W.D.La.1951), *mod. on other grounds,* 145 F.Supp. 523 (W.D.La.1956).

15. 156 F.2d 351, 354 (9th Cir.), *cert. denied,* 356 U.S. 936, 67 S.Ct. 355, 91 L.Ed. 675 (1958).

16. *E. g., Bertha Bldg. Corp. v. National Theatres Corp.,* 248 F.2d 833, 836 (2d Cir. 1957), *cert. denied,* 356 U.S. 936, 78 S.Ct. 777, 2 L.Ed.2d 811 (1958); *Redmond v. Atlantic Coast Football League,* 359 F.Supp. 666, 672 (S.D. Ind.), *aff'd mem.,* 478 F.2d 1405 (7th Cir. 1973); *Occidental Petroleum Corp. v. Buttes Gas & Oil Corp.,* 331 F.Supp. 92, 96–97 (C.D.Cal.1971), *aff'd per curiam,* 461 F.2d 1261 (9th Cir.), *cert. denied,* 409 U.S. 950, 93 S.Ct. 272, 34 L.Ed.2d 221 (1972). *See also Bankers Life & Cas. Co. v. Holland,* 346 U.S. 379, 384, 74 S.Ct. 145, 98 L.Ed. 106 (1953).

17. *See* Plaintiffs' Opposition to Motion to Dismiss Complaint filed by R. J. Reynolds Indus., Inc., McLean Indus., Inc., and Gulf Puerto Rico Lines, Inc., at 4–7 and Exh. A–B.

means of transacting business by the parent corporation.[18]

Plaintiffs here have alleged that Reynolds, McLean, Sea-Land and GPRL represent an integrated and interlocked management scheme so that the three moving defendants were transacting business in this jurisdiction through their relationship with Sea-Land. Applying the principles discussed above to the facts of this case makes it clear that the transacting business requirement is not satisfied. The essential element required before a court can find that one corporate entity was transacting business through an alter ego is control over the conduct that allegedly violated the antitrust laws. *Call Carl, Inc v. B. P. Oil Corp.,* 391 F.Supp. 367, 371 (D.Md.1975); *see Grappone, Inc. v. Subaru of America, Inc.,* 403 F.Supp. 123, 131 (S.D.N.Y.1975). With respect to GPRL, which along with Sea-Land is a cosubsidiary of McLean, there has been not even a suggestion of how GPRL could exercise the required control relationship.

Even though Sea-Land is a wholly owned subsidiary of McLean, which is owned by Reynolds, the separate identities of the subsidiaries are maintained and the evidence indicates that each carries on its activities without having daily business affairs controlled by the parent. *See In re Chicken Antitrust Litigation,* 407 F.Supp. 1285 (N.D. Ga.1975). There has been no evidence that the parent exerted the required degree of control over its subsidiary or was involved directly in its operations and policy decisions. *See Dobbins v. Kawasaki Motors Corp.,* 1974–1 Trade Cas. ¶ 75,100 (D.Or.

1974). Although there is some interlocking management between the three entities,[19] the Court concludes that the control relationship is absent and venue over GPRL, McLean, and Reynolds cannot be predicated on the existence of venue in this jurisdiction over Sea-Land.

The final method of establishing venue in antitrust actions is under section 1391 of the general federal venue statutes. Section 1391(b) is an important section for private antitrust plaintiffs because it allows them to establish venue in the judicial district in which the claim arose, a choice of venue not afforded under the venue provisions of the Clayton Act.[20] In determining whether a particular jurisdiction is actually the district in which the claim arose, it is necessary to consider whether the parties had a significant relationship to the district. This depends upon the occurrence in the district of events such as "sales, injury, conspiratorial meetings, [or] overt acts pursuant to such meetings." *Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp.,* 309 F.Supp. 1053, 1056 (E.D. Pa.1969).

In making this determination, a "weight of contacts" test should be used. 14 Von Kalinowski, *Antitrust Laws & Trade Reg.* § 104.04[2] (1978). This requirement can be satisfied, for example, if significant sales causing substantial injury to plaintiffs occurred in the district or if some other overt act took place that was a "significant and substantial" element of the offense. *Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp.,* 291 F.Supp. 252, 261 (E.D.Pa.1968).

---

18. *See Hitt v. Nissan Motor Co.,* 399 F.Supp. 838, 841 (S.D.Fla.1975) (100% ownership by parent, exchange of officers and employees, and common directors supported finding that parent controlled subsidiary for venue purposes).

19. For example, Malcolm McLean, the president of McLean, also serves as Chairman of the Board of Sea-Land and as a member of the Board of Directors of Sea-Land. Stock ownership and interlocking directorates, however, have been found insufficient to establish venue under the transacting business standard when control over daily business activities is lacking.

*See Hayashi v. Sunshine Garden Prod., Inc.,* 285 F.Supp. 632 (D.Wash.1967).

20. Although there has been some judicial uncertainty whether the general federal venue statute expands special venue provisions, it is now generally recognized that these provisions are available absent contrary statutory restrictions. *See Pure Oil Co. v. Suarez,* 384 U.S. 202, 207, 86 S.Ct. 1394, 16 L.Ed.2d 474 (1966) (Jones Act venue provision expanded by later general venue statute 28 U.S.C. § 1391 so that corporation may also be sued in district where it does business).

Plaintiffs attempt to satisfy the weight of contacts test by alleging that a number of conspiratorial meetings took place in the District of Columbia and that certain legal documents relating to the sale of assets to PRMSA were drafted here.[21] Some courts have held that conspiratorial meetings may be sufficient to establish venue under section 1391 as to each defendant who was present there. *See Ohio-Sealy Mattress Mfg. Co. v. Kaplan,* 429 F.Supp. 139 (N.D.Ill.1977). Before such a rule can be applied, however, it is necessary to find that such meetings took place, that they involved a violation or an attempted violation of the antitrust laws, and that each of the moving defendants participated in them. *ABC Great States, Inc. v. Globe Ticket Co.,* 310 F.Supp. 739, 743 (N.D.Ill. 1970).

Such findings cannot be made here. Although some defendants met with counsel in this jurisdiction and had other contacts here, the Court concludes that such meetings, even if viewed in the light most favorable to plaintiffs, did not represent a violation or attempted violation of the antitrust laws. To the extent that such meetings sought to achieve the passage of Act 62, they were exempted from antitrust liability under the *Noerr-Pennington* doctrine.[22] To the extent they were related to the sale of assets to PRMSA, the state action exemption discussed below would preclude liability.

As a final argument, plaintiffs urge that their claim arose within the meaning of section 1391 because they suffered financial injury in this jurisdiction. At least one court has rejected the weight of the contacts test and held that venue can be established under section 1391 in the judicial district in which the injured plaintiff operated. *Iranian Shipping Lines, S. A. v. Moraties,* 377 F.Supp. 644 (S.D.N.Y.1974); *Albert Levine Assoc. v. Bertoni & Cotti, S.P.A.,* 314 F.Supp. 169 (S.D.N.Y.1970).

To hold that a cause of action necessarily arose in the district in which the plaintiff was injured is a "simplistic rationale to which antitrust actions are not susceptible." *Redmond v. Atlantic Coast Football League,* 359 F.Supp. 666, 669 (S.D.Ind.), *aff'd mem.,* 478 F.2d 1405 (7th Cir. 1973). The Court agrees with this conclusion and holds that plaintiff's allegations of injury in this district will not support a finding of venue here. To hold otherwise would be tantamount to extending venue under section 1391 to any district in which the plaintiff resides, a result clearly not contemplated by the rules. *Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp.,* 291 F.Supp. 252, 260 (E.D. Pa.1968).

After careful review of the facts of this case, the Court concludes that, despite their vigorous efforts, plaintiffs have failed to establish that venue exists in this jurisdiction over defendants Reynolds, McLean, and GPRL. Although venue is also probably deficient with respect to the other moving defendants, in the interests of judicial economy and achieving a resolution on the merits, the Court will not address these motions but will instead consider the alternative motions for summary judgment based on the state action exemption to the antitrust laws.

## STATE ACTION EXEMPTION

The governmental and remaining private defendants have moved for summary judgment [23] on the ground that the conduct at

---

21. *See* affidavit of John R. Immer, Exh. C to Plaintiffs' Opposition to Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment. Plaintiffs also describe meetings and other contacts between various defendants and the Federal Maritime Commission but such governmental contacts by federally regulated industries do not constitute "transacting business" in the District of Columbia. *Fandel v. Arabian American Oil Co.,* 120 U.S.App.D.C. 193, 345 F.2d 87 (1965).

22. *Eastern R. R. Presidents Conference v. Noerr Motor Freight,* 365 U.S. 127, 31 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *see* page 725 *infra.*

23. Defendant Sea-Land has moved for partial summary judgment on any issues of antitrust liability arising out of its sale of certain operational assets to PRMSA.

issue in this lawsuit is immune from liability under the state action exemption to the antitrust laws. Because the immunity of private parties derives from a determination that the conduct of the state entities is so immunized, it is first necessary to consider the applicability of the state action exemption to Puerto Rico defendants.

■ The principle that state action is beyond the scope of federal antitrust laws stems from the decision of the Supreme Court in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). In *Parker* the Court rejected a producer's claim that a state agricultural marketing program established pursuant to statute violated the Sherman Act. Noting that the state had adopted the program to restrict competition and maintain prices, the Court held that Congress intended the Sherman Act to restrain private anticompetitive conduct and not actions taken by a state or its agencies in furtherance of a legislative mandate. There is no dispute that Puerto Rico is a state for purposes of applying the *Parker* doctrine. *International Tel. & Tel. Corp. v. General Tel. & Elec. Corp.,* 351 F.Supp. 1153, 1229 (D.Hawaii 1972), *mod. on other grounds,* 518 F.2d 913 (9th Cir. 1975).

Defendants argue that the actions of a state instrumentality mandated by clear legislative authority are immune from antitrust liability under *Parker*.[24] They note

that in this case the Puerto Rico legislature specifically mandated its instrumentality, PRMSA, to take over and operate the shipping trade between the East Coast and Gulf ports of the United States and Puerto Rico. PRMSA carried out the mandate by acquiring and operating ships in this trade, and defendants argue that as a result, the PRMSA acquisition and operation of the steamships are immune from antitrust liability.

**A. State Instrumentalities.**

After a long period of silence, the Supreme Court in recent years has given renewed attention to the scope of the *Parker* doctrine[25] and its decisions have been the subject of extensive legal commentary.[26] The most recent case involving the doctrine is *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978), in which the Court held municipalities could not invoke the *Parker* doctrine in a suit for antitrust violations allegedly committed by them in connection with ownership of public utilities.

In refusing to find antitrust immunity, a plurality of the Court held that municipalities, like other state instrumentalities, are not exempt from application of the antitrust laws simply by virtue of their status as governmental entities. *Id.* at 413, 98 S.Ct. 1123, 1137. The plurality stated: "We therefore conclude that the *Parker* doctrine

---

**24.** The terms "state action exemption" and "antitrust immunity" are frequently used to refer to the *Parker* doctrine, but these terms are less than accurate in view of the Supreme Court's statement that "[t]he Sherman Act makes no mention of the state as such, and gives no hint that it was intended to restrain state action." 317 U.S. at 351, 63 S.Ct. at 313, see *Kurek v. Pleasure Driveway & Park Dist.,* 557 F.2d 580, 587 n.5 (7th Cir. 1977) (Sherman Act was not intended to apply to state-mandated activities but courts nonetheless utilize single-word shorthand references of "exemption" or "immunity").

**25.** *See City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978); *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976); *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95

S.Ct. 2004, 44 L.Ed.2d 572 (1975). Prior to these decisions there had been a 32-year period in which the Supreme Court consistently declined to review cases involving the *Parker* doctrine. *See, e. g., George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.,* 424 F.2d 25 (1st Cir.), *cert. denied,* 400 U.S. 850, 91 S.Ct. 54, 27 L.Ed.2d 88 (1970); *E. W. Wiggins Airways, Inc. v. Massachusetts Port Auth.,* 362 F.2d 52 (1st Cir.), *cert. denied,* 385 U.S. 947, 87 S.Ct. 320, 17 L.Ed.2d 226 (1966).

**26.** *E. g.,* Handler, *The Current Attack on the Parker v. Brown State Action Doctrine,* 76 Colum.L.Rev. 1 (1976); Kennedy, *Of Lawyers, Lightbulbs, and Raisins: An Analysis of the State Doctrine under the Antitrust Laws,* 74 Nw.U.L.Rev. 31 (1979); Verkuil, *State Action Doctrine, Due Process and Antitrust: Reflections on Parker v. Brown,* 75 Colum.L.Rev. 328 (1975); Note, *Anti-Trust Law and Municipal Corporations,* 65 Geo.L.J. 1547 (1977).

exempts only anticompetitive conduct engaged in as an act of government by the State as sovereign, or, by its subdivisions, pursuant to state policy to displace competition with regulation or monopoly public service." *Id.*[27]

*City of Lafayette* thus establishes a twofold inquiry that must guide the Court in applying the *Parker* doctrine. The first consideration is whether the state, acting as sovereign, has required its agency or instrumentality to engage in the particular form of anticompetitive conduct. This is not to suggest that the *Parker* doctrine permits each state legislature to determine the extent to which a particular government agency under its control should be exempt from the antitrust laws. As the Court in *Parker* indicated, "a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful." 317 U.S. at 351, 63 S.Ct. at 314. The decision did recognize, however, the overriding policy of federalism, namely, that "[i]n a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress." *Id.*

In order for *Parker* to apply, it is not necessary for a state legislature to direct its instrumentality to perform a specific anticompetitive act. The threshold requirement for *Parker* immunity is satisfied if the legislature directs its instrumentality to engage in a particular type of activity. As the plurality opinion in *City of Lafayette* stated:

> While a subordinate governmental unit's claim to *Parker* immunity is not as readily established as the same claim by a

state government sued as such, we agree with the Court of Appeals that an adequate state mandate for anticompetitive activities of cities and other subordinate governmental units exists when it is found "from the authority given a governmental entity to operate in a particular area, that the legislature contemplated the kind of action complained of." 435 U.S. at 415, 98 S.Ct. at 1138.

In this case, there is no dispute that PRPA and PRMSA are agencies of the Commonwealth of Puerto Rico.[28] The Statement of Motives of Act 62, which established PRMSA, contains a clear expression of legislative intent:

> The Legislature of Puerto Rico intends that this instrumentality acquires and operates shipping lines and terminal facilities as a public service, and that in doing so, it shall not be subject to the antitrust laws nor any other limitation that could hinder the effective discharge of the endeavor that this act has imposed on the public instrumentality hereby established.

In addition, section 25 of the Act repeats the intention of the legislature that PRMSA, in carrying out its mandate to provide efficient, reliable, and economic maritime services, not be subject to antitrust laws:

> *Conflicting Laws Inapplicable.* Insofar as the provisions of this act are in conflict with the provisions of any other law, or parts thereof, the provisions of this act shall prevail. Specifically, and without otherwise limiting the generality of the foregoing, it is intended by this act that the Antitrust Laws shall not be applicable to any action of the Authority taken pursuant to the provisions hereof.

A recent case construed this statute under the criteria set out by the Supreme Court in *City of Lafayette.* In *Star Lines, Ltd. v. Puerto Rico Maritime Shipping Au-*

---

**27.** Chief Justice Burger, who provided the fifth vote for affirmance of the Fifth Circuit's decision in *City of Lafayette,* did not join in this portion of the opinion but his concurrence indicates that he regarded the plurality's approach as the minimum to be required of a state instrumentality, which he felt should demonstrate that it is acting in a proprietary capacity

before it is allowed the protection of *Parker.* 435 U.S. at 418, 98 S.Ct. 1123 (Burger, C. J., concurring); *see Star Lines Ltd. v. Puerto Rico Maritime Shipping Authority,* 451 F.Supp. 157, 165 (S.D.N.Y.1978).

**28.** *See* P.R. Laws Ann., tit. 23, § 333(b) (1955); Act, *supra* note 2, § 4.

*thority,* 451 F.Supp. 157 (S.D.N.Y.1978), a Liberian corporation sued PRMSA for alleged antitrust violations arising from the short-term lease of a PRMSA vessel not needed in the Puerto Rico trade to plaintiff's competitor in the Persian Gulf. In denying PRMSA's motion to dismiss the complaint for failure to state a claim upon which relief can be granted, the district court held that the transaction in question—leasing a ship to others to operate in foreign trade unrelated to Puerto Rico—was not performed pursuant to any governmental policy to displace competitive market forces in the area. *Id.* at 166. It found that "the connection between the legislative grant of power to PRMSA and its use of that power under the facts of this case is simply 'too tenuous to permit the conclusion that the entity's intended scope of activity included such conduct.'" *Id.* at 167 (*quoting City of Lafayette v. Louisiana Power & Light Co.,* 532 F.2d 431, 434 (5th Cir. 1976), *aff'd* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978)).

The Court noted, however, that if the challenged conduct were such that it could reasonably have been contemplated by the legislature as necessary to ensure complete and reliable carrier service or proper maintenance of port facilities, it could withstand attack under the antitrust laws. It stated:

> Certainly if the conduct being challenged here were that PRMSA had reduced competition in the Puerto Rican-East Coast trade by acquiring a majority of those vessels suitable for engaging in that trade, or that PRMSA had contracted with a single private company to control Puerto Rico's port facilities, PRMSA's claim to antitrust immunity would be on much stronger ground.

*Id.* (footnotes omitted).

▮ Plaintiffs do not deny that the Puerto Rico legislature not only intended,

but in fact authorized and mandated, state control of all shipping lines operating between Puerto Rico and the Eastern and Gulf ports of the United States. Neither do they dispute that the legislature intended to immunize the acquisition and operation of the shipping lines from federal antitrust laws.[29] Instead they urge that the *Parker* doctrine is inapplicable to this situation because the immunized state conduct consisted of acts outside the territory over which the state had legislative jurisdiction.

In support of this argument, plaintiffs rely on one of the few cases to raise this issue, *Ladue Local Lines, Inc. v. Bi-State Development Agency,* 433 F.2d 131 (8th Cir. 1970). *Ladue* involved a political entity created by the legislatures of Illinois and Missouri to acquire and operate a public transit system in eastern Missouri and western Illinois. Plaintiff, a private company that engaged in bus transportation in the same area, brought an antitrust action alleging that defendant's monopolistic control of the public transportation market had destroyed its business by precluding it from bidding on and servicing schools and school systems. *Id.* at 132.

Affirming the district court's dismissal of the action, the court of appeals held that when a political body created by the legislatures of Illinois and Missouri was acting under Congressionally-approved authorization[30] to operate bus transportation facilities and that authorization was granted pursuant to a legislative policy that public interest would best be served by a unified public transportation system, the activity was not subject to the antitrust laws even though a monopoly was created. *Id.* at 137. Plaintiffs urge that in the absence of such interstate agreement, any unilateral attempt by one sovereign to displace competi-

---

**29.** *See* Plaintiffs' Opposition to the Motion to Dismiss the Complaint by the Puerto Rican Defendants, at 2.

**30.** Bi-State was organized pursuant to a compact entered into by the states of Illinois and Missouri. The consent of Congress to such compacts is required by Article I, Section 10,

Clause 3 of the Constitution, which states in part: "No State shall, without the Consent of Congress . . . enter into any Agreement or Compact with another State . . . ." The Bi-State compact was approved by the Act of August 31, 1950, Pub.L.No.81–743, 64 Stat. 568.

tion in another jurisdiction will not survive scrutiny under federal antitrust laws and seek to apply this argument to the situation here.

To the extent that plaintiff's argument suggests that a state's immunity under the antitrust laws is limited to its own territory, it ignores a central truth of the *Parker* doctrine. A necessary element of any violation of the federal antitrust laws is an effect on interstate commerce.[31] As commentators have noted, in a unitary economic system such as ours, jurisdiction under the Sherman Act should be presumed on the ground that every restraint "has the inherent tendency to affect interstate resource allocation and the interstate movement of goods and services in our national economy."[32]

The exemption created in *Parker v. Brown* for state action must be coextensive with the scope of the Sherman Act, and thus is applicable to the interstate effects of a particular form of state action. *Parker v. Brown* itself supports this analysis, for that case involved action by the State of California to raise and stabilize the price of raisins, ninety-five percent of which were sold outside the state. 317 U.S. at 345, 63 S.Ct. 307. Plaintiffs' "extraterritoriality" argument is in direct conflict with the fundamental message of *Parker* that the entire Sherman Act, including its extraterritorial coverage, was never intended to restrain state action undertaken pursuant to a proper legislative mandate to displace competition.

In summary, the most recent judicial interpretations of the state action doctrine require that the anticompetitive conduct engaged in by a state instrumentality be un- dertaken pursuant to a governmental policy to displace competition with regulation or monopoly public service. Here the Puerto Rico legislature, in an attempt to ensure adequate carrier and passenger service between Puerto Rico and the mainland, specifically mandated its instrumentality PRMSA to take over and operate the shipping trade. PRMSA carried out that mandate by acquiring and operating the steamships in such trade. This conduct, which is the subject of plaintiffs' complaint, is immune from antitrust liability under the state action doctrine.

PRPA acted under a similar legislative mandate to operate the transportation facilities of Puerto Rico and to establish rules and regulations for their use. This conduct was also undertaken in the exercise of a valid governmental function and is similarly immune from antitrust liability. *See E. W. Wiggins Airways, Inc. v. Massachusetts Port Authority*, 362 F.2d 52, 55 (1st Cir.), cert. denied, 385 U.S. 947, 87 S.Ct. 320, 17 L.Ed.2d 226 (1966).

**B. *Private Defendants.***

The issue of the antitrust immunity of private parties did not arise in *Parker* because that case involved an equity suit against state officials. 317 U.S. at 344, 63 S.Ct. 307. Although there has been some judicial uncertainty regarding the reach of the *Parker* doctrine, it seems clear that a majority of the present Supreme Court believes that *Parker* is equally applicable to suits against private parties whose actions are compelled or regulated by the state.[33] The correctness of this interpretation becomes apparent by considering the facts of the original *Parker* case. In that instance,

---

**31.** Sections 1 and 2 of the Sherman Act are applicable only to "trade or commerce among the several States." 15 U.S.C. §§ 1, 2. Section 3 of the Sherman Act applies to contracts, combinations, or conspiracies "in restraint of trade or commerce in any Territory of the United States or of the District of Columbia, or in restraint of trade or commerce between any such Territory and another, or between any such Territory or Territories and any State or States or the District of Columbia, or with foreign nations, or between the District of Co- lumbia and any State or States or foreign nations . . . ." 15 U.S.C. § 3.

**32.** P. Areeda and D. Turner, 1 *Antitrust Law* ¶ 232a, at 229–30 (1978).

**33.** *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 603, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1976) (Burger, C. J., concurring in part); *id.* at 605, 613 n.5, 97 S.Ct. 2691 (Blackmun, J., concurring in judgment); *id.* at 614–15, 97 S.Ct. 2691 (Stewart, Powell and Rehnquist, JJ., dissenting).

if the federal government or a private litigant could have enforced the antitrust laws against the raisin producers, effectuation of state policy would have been thwarted just as if the state action immunity were never granted. P. Areeda & D. Turner, 1 *Antitrust Law*, ¶ 212b, at 69 (1978); *see Trans-World Assoc. v. Denver*, 1974–2 Trade Cas. ¶ 75,293 (D.Colo.1975).

In the present action the nongovernmental defendants maintain that their conduct is immune from antitrust liability because of the state action immunity applicable to PRMSA. The Court agrees with this interpretation, for it would be anomalous to hold that PRMSA, the state-sanctioned mechanism for acquiring control of the island's ocean transportation, was immune as the buyer of the assets of certain carriers and simultaneously to withhold such immunity from the selling carriers. Similarly defendants PRMMI, TKM, and TOTEM, whose involvement in this lawsuit arises from their operation and management of cargo vessels on behalf of PRMSA, cannot be held liable under the antitrust laws if PRMSA's conduct in operating the ships was immunized.

A similar conclusion regarding the immunity of private parties engaged in business enterprises with state instrumentalities has been reached by other courts. In *Trans-World Assoc., Inc. v. Denver, supra,* plaintiff sought to operate a rent-a-car concession at the city airport, but its application was denied on the ground that it was city policy to permit only five concessionaires to operate at any one time. The city and the existing concessionaires were named as defendants in an action alleging conspiracy and attempt to monopolize the airport car rental business. The Court dismissed the causes of action involving the city of Denver on the basis of the state action exemption and further held that "since the city is privileged to enter into negotiations and agreements, which might otherwise violate

the Sherman Act, those with whom the cities contract are similarly entitled to antitrust immunity." *Id.* at 97,900.[34]

Plaintiffs also appear to suggest that the actions of the private defendants in lobbying and advising the Puerto Rico government and legislature regarding the desirability and organization of a state shipping authority precludes any claim that their actions were compelled and that, in the absence of such compulsion, defendants cannot claim immunity under *Parker*. Two recent Supreme Court cases have raised the possibility that a private party's right to antitrust immunity may depend upon whether the challenged actions were compelled by a state. In *Goldfarb v. Virginia State Bar*, the Court refused to extend antitrust immunity to Bar Association minimum fee schedules and offered as one of its reasons: "It is not enough that . . . anticompetitive conduct is 'prompted' by state action; rather, anticompetitive activities must be compelled by direction of the State acting as a sovereign." 421 U.S. 773, 791, 95 S.Ct. 2004, 2015, 44 L.Ed.2d 572 (1975). Similar sentiments were expressed in *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976). A program for providing light bulbs was originally proposed by the utility but was made mandatory by the state utility commission. Concluding that the option to have the program was the utility's and was not imposed by the commission, the Court determined that the defendant "exercised sufficient freedom of choice" for the Court to find that compulsion was absent. *Id.* at 593, 96 S.Ct. 3110.

The role that compulsion should play in determining antitrust immunity is left unclear by these cases, which involve different forms of state action than the ones presented here. In *Goldfarb* and *Cantor* the Court recognized that neither adequate supervision nor state intent to displace antitrust

---

34. *See also Padgett v. Louisville & Jefferson City Air Bd.*, 492 F.2d 1258 (6th Cir. 1974) (per curiam); *Saenz v. University Interscholastic League*, 487 F.2d 1026 (5th Cir. 1973); *E. W. Wiggins Airways, Inc. v. Massachusetts Port Auth.*, 362 F.2d 52 (1st Cir.), *cert. denied*, 385 U.S. 947, 87 S.Ct. 320, 17 L.Ed.2d 226 (1966); *Metro Cable Co. v. CATV of Rockford*, 375 F.Supp. 350 (N.D.Ill.1974).

enforcement could be demonstrated. It has been suggested that the presence or absence of compulsion is important because it provides evidence of state intent.[35] Compulsion establishes that the state intends to displace the antitrust laws for otherwise the compulsion would be without purpose and effect. Similarly lack of compulsion suggests that intent to provide immunity does not exist. In this case there is clear independent evidence in Act 62 itself that antitrust immunity is intended. It is therefore unnecessary to look to the presence or absence of compulsion as evidence of intent.

Earlier Supreme Court decisions also establish that a court cannot require the absence of initiative or lobbying by a defendant before granting him immunity. The *Parker* case itself is proof to the contrary, for there, raisin producers initiated the procedure leading to state restrictions. Their representatives formulated the plan reviewed and approved by the California legislature and the plan took effect only upon a favorable referendum among raisin producers.

Plaintiffs' argument that compulsion is required is also refuted by the Supreme Court's decision in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 31 S.Ct. 523, 5 L.Ed.2d 464 (1961), in which the Court held that, regardless of anticompetitive purpose or intent, a concerted effort by persons to influence lawmakers to enact legislation beneficial to themselves or detrimental to competitors was not within the scope of the antitrust laws. This decision is based on two principles. The first is that a contrary holding would impede the communication between citizens and their lawmakers, without which a representative democracy could not function. The second element is the threat to the constitutionally protected right of petition that would result from a contrary construction. *Id.* at 137–38, 31 S.Ct. 523.[36] Thus the actions of some private defendants in lobbying the Puerto Rico government prior to the formation of PRMSA does not preclude their claim to exemption from antitrust liability under the state action exemption.

PRMSA and PRPA have established that they are governmental agencies acting pursuant to a legislative mandate to displace competition with a public monopoly. As such, their actions in acquiring vessels and operating them in the United States-Puerto Rico trade, which form the basis of this complaint, are exempt from antitrust liability under the *Parker* doctrine. The conduct of the private defendants in selling vessels to PRMSA or in operating them on behalf of PRMSA is similarly immunized. Accordingly, the moving parties' motions for summary judgment are granted and this action is dismissed.

**35.** P. Areeda & D. Turner, *supra* note 32, ¶ 215b, at 96.

**36.** *See also United Mine Workers v. Pennington*, 381 U.S. 657, 669–72, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). *Pennington* held that, regardless of the anticompetitive purpose or effect on small competing mining companies, the joint action of certain large mining companies and labor unions in lobbying the Secretary of Labor for legislation establishing a minimum wage for employees of contractors selling coal to the Tennessee Valley Authority and in lobbying the TVA to avoid coal purchases exempted from the legislation was not subject to antitrust attack. Cases subsequent to *Pennington* have emphasized that any contrary construction would pose a serious threat to first amendment freedoms. *See Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 707–08, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 516, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972) (Stewart, J., concurring in judgment).